UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO.: 19-12337 |
| | * | |
| ROYAL ALICE PROPERTIES LLC | * | SECTION "A" |
| | * | |
| Debtor | * | CHAPTER 11 |
| | * | |
| ****************************************** | | |
| | * | |
| ROYAL ALICE PROPERTIES LLC | * | |
| | * | |
| Plaintiff | * | ADV. NO.: 19-01133 |
| v. | * | |
| | * | |
| AMAG, INC. | * | |
| | * | |
| Defendant | * | |
| ****************************************** | | |

### DECLARATION OF PETER M. HOFFMAN IN SUPPORT OF DEBTOR ROYAL ALICE PROPERTIES LLC's MOTION FOR SUMMARY ADJUDICATION

I, PETER M. HOFFMAN, declare as follows:

1. I am an authorized representative of Debtor Royal Alice Properties LLC ("Debtor") and file this Declaration in support of Debtor's Motion For Summary Adjudication. I have personal knowledge of the matters set forth herein and can testify competently to each if called as a witness.

2. I was indicted on February 6, 2014 and convicted after a jury trial in April of 2015 of Federal wire fraud charges that I consider a miscarriage of justice. During this period, I was the Chief Executive Officer and a shareholder of Seven Arts Entertainment Inc. ("SAE"), a public company then traded in the "pink sheets." As result of the charges and conviction, SAE was forced to cease operations and I suffered substantial financial reverses.

3. I owned a home in Los Angeles on 1643 Queens Road ("Peter's Home"). The principal lender on Peter's Home was JP Morgan Chase Bank N.A ("Chase") as successor to Washington Mutual Bank F.A. ("WaMu"). Chase offered me several home modification proposals which I considered unacceptable. As a result, I filed an action against Chase for an injunction against foreclosure and declaratory relief regarding my rights under law ("Chase Action"), a true, correct and authentic copy being attached hereto as Exhibit 1.

4. On or about September 21, 2016, I entered into a Settlement Agreement ("Chase Settlement") under which I agreed to a stipulated foreclosure sale of Peter's Home, a true, correct and authentic copy being attached hereto as Exhibit 2.

5. Peter's Home was sold at a foreclosure sale for $1,500,000 pursuant to a deed of trust held by Chase on October 27, 2016, a true, correct and authentic copy of the Deed at Foreclosure being attached as Item A in the Request For Judicial Notice filed by Debtor herewith ("RJN"). A true, correct and authentic copy of the deed of trust in favor of WaMu on which the foreclosure sale was based is attached as Item B to the RJN ("Chase DOT") and a true, correct and authentic statement of the amounts owed on the Chase DOT on or about the date of the foreclosure sale is attached hereto as Exhibit 3.

6. I executed a deed of trust or mortgage in favor of Palm Finance Corp. ("Palm") in connection with the financing of two motion pictures entitled "Asylum" and "No Good Deed" ("A/NGD Debt"), a true, correct and authentic copy being attached as Item C of the RJN ("2003 DOT").

7. No amounts were due on the A/NGD Debt on the date of the foreclosure sale.

8. The 2003 DOT was never amended as filed in the Los Angeles County property records to apply to any other indebtedness held by Palm or AMAG to which I had executed a

guarantee or was otherwise liable and no such amendment would have given Palm or AMAG priority over other deeds of trust or mortgages on Peter's Home.

9. On the date of the foreclosure sale, these deeds of trust encumbered Peter's Home in the following order of priority based on date of filing: (a) Chase DOT in an approximate amount of $1,100,000, (b) the 2003 DOT, (c) a "second" deed of trust in favor of WaMu for $500,000, (d) a judgment lien in favor of Jay Firestone for $350,000, and (e) a further deed of trust in favor of Palm securing other film indebtedness ("2016 DOT"). True correct and authentic copies of each of these give deeds of trust are attached as Items B through F to the RJN.

10. I entered into a Guaranty dated July 31, 2013 ("Guaranty") under which I agreed to guarantee full repayment of the Promissory Note and Loan Agreement dated July 31, 2012 entered into between AMAG, Inc. ("AMAG") and Palm, a true, correct and authentic copy being attached hereto as Exhibit 4.

11. I instructed the trustee under the Chase DOT to pay to Palm all proceeds in excess of the amounts due to Chase and warned Palm that the trustee required proof of its right to payment. Palm then provided to the trustee as the basis for payment the 2003 DOT and 2016 DOT. Only the 2003 DOT had priority and was sufficient for the trustee to make payment of the excess proceeds to Palm. Palm claimed to the trustee that the amounts owed pursuant to the 2016 DOT were due pursuant to the 2003 DOT even though by the 2003 DOT had never been amended to include security for the amounts secured by the 2016 DOT. True, correct and authentic copies of my warning to Palm and Palm's use of the 2003 DOT to obtain the excess proceeds from the foreclosure sale are attached hereto as Exhibit 5.

12. On June 1, 2017, the trustee under the Chase DOT paid the sum of $392,779.75 ("Peter's Credit") to Palm, as confirmed by an executive of AMAG and Palm of that date, a true correct and authentic copy being attached as Exhibit 6.

13. I entered into the Chase Settlement and instructed the trustee to pay funds to Palm pursuant to the 2003 DOT solely in payment on the AMAG Loan because the Guaranty was the most onerous obligation which I owed to AMAG or Palm. The AMAG Loan was secured by Mrs. Hoffman's home. My other guarantees to Palm related to film loans which had been settled between Palm and SAE, and all film collateral had already been assigned to Palm in satisfaction of those loans pursuant to a Loan Workout Agreement dated August 31, 2014 ("Workout Agreement"), a true correct and authentic copy being attached hereto as Exhibit 7.

14. When an executive of Palm and AMAG stated that Palm would not apply Peter's Credit to the AMAG Loan, I wrote back: "Ouch!! This should be applied to Susan's loan" referring to the AMAG Loan. I stated to the principal of AMAG and Palm, Steven Markoff, in no less than four meetings with him in the period from on or about January of 2016 through October of 2016 that I was declining a home modification loan on Peter's Home and allowing it to be sold at foreclosure solely to pay down the AMAG Loan. A true, correct, and authentic copy of my email exchange with an executive of Palm and AMAG, Mr. Markoff is attached hereto as Exhibit 6 ("June Emails").

15. AMAG did not credit Peter's Credit to the AMAG Loan as confirmed in the June Emails.

16. As a condition to the AMAG Loan, AMAG insisted that Mrs. Hoffman acquire 36,625 shares of preferred stock of SAE ("SAE Preferred Stock"). The SAE Preferred Stock was worthless on July 31, 2013, the date of execution of the AMAG Loan. Attached as Exhibit 8 is a

true, authentic and correct copy of a NASDAQ sales report on sales of SAE common stock in 2014 through 2019 showing that the trading price of SAE common stock, which quickly declined to a nil price. The SAE Preferred Stock was worthless because it could not be publicly traded even at the rapidly declining price of SAE common.

17. On or about the execution of the AMAG Loan and to attempt to remedy Mrs. Hoffman's acquisition of the worthless SAE Preferred Stock, I stated to Mrs. Hoffman that I believed that investment bankers trading SAE common stock would acquire the SAE Preferred if SAE agreed to a drastically lower exchange price for conversion in SAE common stock, which the banks would then sell on the public market. The SAE Preferred Stock was worthless. The only possible recovery would be such a modification of the conversion rate. However, the then pending criminal investigation against me prevented any such acquisition in the months after closing of the AMAG Loan. The investment bankers declined to acquire the SAE Preferred Stock because the SAE common stock was then worthless and could not be traded in any material volume on the public markets.

18. Palm failed to deliver the SAE Preferred Stock to Mrs. Hoffman because Palm did not surrender the certificate to SAE for cancellation and SAE did not issue a new certificate to Mrs. Hoffman as required by SAE's By-Laws, true, correct and authentic copies being attached hereto as Exhibit 9, and as required by NEVADA REV. STAT. §§78.235, 78.240. Pursuant to Article II Section 2.04 and Article VI of the By-Laws adopted in accordance with Sections 78.235 and 78.240, no preferred stock would be issued to Mrs. Hoffman absent execution of a certificate by two officers of SAE and no such certificate was ever prepared or executed by any officer of SAE. The investment bankers who had indicated a desire to acquire the SAE Preferred Stock would not proceed without a validly issued certificate for the SAE Preferred Stock.

19. Palm had no cash cost basis for its acquisition of the SAE Preferred Stock. Palm was required to purchase the SAE Preferred Stock as a condition to receipt of approximately $4,500,000 of funds used to reduce film indebtedness of SAE and its affiliates. Despite Debtor's Request For Production of the agreements under which Palm acquired the SAE Preferred Stock and its sale of SAE indebtedness in return for approximately $4,500,000 proceeds, and despite AMAG counsel's statement in open court that it would produce over 1,000 pages of such documents, AMAG has failed to produce any of these documents.

20. I was able to locate two partially executed contracts for the sale of SAE's indebtedness to Palm, to be converted into SAE common stock and sold on NASDAQ by the purchaser, under which Palm received $1,750,000 of the approximately $4,500,000 ultimately received by it. True, correct and authentic copies of such partially executed contracts are attached as Exhibit 10.

21. Mrs. Hoffman entered into the AMAG Loan because (a) Whitney Bank was threatening to foreclose on her home and (b) Jonesfilm, had improperly recorded a *lis pendens* on Mrs. Hoffman's home which created a cloud on title that need to be removed before any refinancing of Mrs. Hoffman's mortgage could occur, as explained in correspondence with AMAG, true, correct and authentic copies being attached hereto as Exhibit 11. Mrs. Hoffman believes her situation was dire and the AMAG Loan was critically needed to resolve these two issues.

22. The Jonesfilm judgments improperly recorded as *lis pendes* on Debtor's real property resulted from my film business (production of the motion picture "9&1/2 Weeks II." Mrs Hoffman had no involvement in the production of that picture or any of the litigation that arose in connection with it.

23. I have engaged in numerous negotiations and lending agreements with AMAG and Palm since early 2003. At all time, Mr. Markoff stated to me that he was the sole owner and director of both AMAG and Palm which operated out of his office in Los Angeles. I considered AMAG, Palm and other companies controlled by Mr. Markoff as a single business enterprise with no difference between or among them for purposes of my dealings with both AMAG and Palm.

I hereby declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct. Signed at Los Angeles, California on August 28, 2020.

*/s/ Peter M. Hoffman*
_____
Peter M. Hoffman