UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO.: 19-12337 |
| | * | |
| ROYAL ALICE PROPERTIES LLC | * | SECTION "A" |
| | * | |
| Debtor | * | CHAPTER 11 |
| | * | |
| ****************************************** | * | |
| | * | |
| ROYAL ALICE PROPERTIES LLC | * | |
| | * | |
| Plaintiff | * | ADV. NO.: 19-01133 |
| v. | * | |
| | * | |
| AMAG, INC. | * | |
| | * | |
| Defendant | * | |
| ****************************************** | | |

**DEBTOR ROYAL ALICE PROPERTIES LLC'S OPPOSITION TO DEFENDANT AMAG INC.'S MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes Debtor Royal Alice Properties LLC ("Debtor") who opposes the Motion For Summary Judgment ("AMAG MSJ") [ECF No. 51] filed by Defendant AMAG Inc. ("AMAG"). Debtor has filed its Motion For Summary Adjudication ("Debtor MSA") [ECF No. 1] seeking judgment in its favor on the three disputes that have arisen in calculation of the loan balance due under that certain Promissory Note and Loan Agreement dated July 31, 2013 by and among AMAG and Debtor ("AMAG Loan"). As will be apparent to the Court, the AMAG MSJ and Debtor MSA are "ships passing in the night," with AMAG's MSJ studiously avoiding the undisputed material facts set forth in Debtor's Separate Statement of Material Facts ("SSUMF") [ECF No. 57] and the legal conclusions that follow from

those SSUMF applicable to these three issues: Peter's Credit, Simulated Sale and Usurious Interest:[1]

      A.    <u>Peter's Credit</u>. Although cited to it in Debtor's efforts to seek settlement of these disputes, AMAG declines to address the controlling Louisiana law that grants to Mr. Hoffman, not AMAG, the right to designate which of several obligations his payment of $392,779.75 was to be applied. Even if Mr. Hoffman remained liable as a guarantor of the "Autopsy Loan" (he is not),[2] he was also liable on his Guaranty dated July 31, 2012 [SSUMF A7] of the AMAG Loan. That Guaranty was the most onerous debt Mr. Hoffman owed (or could have owed) to Palm and AMAG and was the debt he designated for payment. AMAG does not and cannot contend otherwise. If AMAG has some new cognizable defense to application of this fundamental aspect of the Louisiana Obligation Law not so far stated, Debtor will respond in its Reply to AMAG's Opposition to the Debtor MSA.

As stated in Debtor's MSA, at the time of its filing, Debtor did not yet have the Transcript of the Deposition of Steven Markoff, the principal of AMAG and Palm, taken on August 27, 2020 ("Markoff Tr.") and could not provide it in support of Debtor's SSUMF. The Markoff Tr. is now available and attached to the Supplemental Declaration of Peter Hoffman ¶9 ("PMH Supp Dec") filed herewith. The Markoff Tr. at 14-21, 31-35, 40-49, confirms SSUMF A12 by numerous admissions that AMAG and Palm are a single business enterprise under principles familiar to this

---

[1] All defined terms shall have the meanings assigned in Debtor's Memorandum of Points and Authorities [ECF No. 59] filed in support of the Debtor MSA.

[2] As defined in AMAG's Section 56.1 Statement ("AMAG 56.1 Statement") No. 35 [ECF No. 53] dated May 7, 2002 which Mr. Hoffman guaranteed in the Autopsy Guaranty, AMAG 56.1 Statement No. 36, and to which AMAG purported to apply Peter's Credit, AMAG 56.1 Statement 44.

2

Court and set forth in *Green v. Champion Ins. Co.,* 577 So.2d 249, 257 (La. 1st Cir.) *writ denied* 580 So.2d 668 (1992).

Mr. Markoff forthrightly admits that AMAG and Palm are both owned and controlled entirely by Mr. Markoff and managed by him from his offices in Los Angeles.[3] Mr. Markoff admits that the accounting and administration of Palm and AMAG are centralized under his management in those offices in Los Angeles. It is thus irrelevant to which of AMAG and Palm Peter's Credit was paid. Peter's Credit went to the benefit of this single business enterprise and Mr. Hoffman was entitled under Louisiana law to designate to which of his debts Peter's Credit should be applied.

Further, Mr. Hoffman disputes that he remained liable under his Autopsy Guaranty at the time (June 1, 2017) Palm applied Peter's Credit to the Autopsy Loan. As set forth in the PMH Supp Dec ¶¶4-5 & Ex. 1, 2, filed in support of Debtor's Response to AMAG's 56.1 Statement, Mr. Hoffman's Autopsy Guaranty was terminated by the transfer of all Seven Arts' film assets pursuant to the Workout Agreement and Assignment of Assets dated August 28, 2014 ("Workout"). Mr. Hoffman contends, as a disputed issue of fact, that the film assets transferred satisfied his Autopsy Guaranty as he stated to Palm at the time of the Workout. Seven Arts would not have entered into the Workout unless the Assignment satisfied the Autopsy Guaranty.

In addition, *contra* AMAG, any claims by AMAG under the Autopsy Guaranty were barred by the applicable four-year California statute of limitations, CAL. CODE CIV. PROC. §337, or at least raise disputed issues of material fact as to whether collection of the Autopsy Guaranty was

---

[3] Notably when Mr. Markoff was asked: "Is there any reason why a loan is made by AMAG versus Palm Finance?", he answered: "Not specifically." Markoff Tr. At 45. When asked whether a particular loan was made by Palm or AMAG, Mr. Markoff answered: "I'm not sure." Markoff Tr. At 40.

so barred on June 1, 2017. CAL. CODE CIV. PROC. §360 does not extend the four-year limitation period for the Autopsy Guaranty because the payments made by SAE on the Autopsy Loan in early 2014, cited in AMAG 56.1 Statement 42, were not made <u>by Mr. Hoffman</u> who is "the party to be charged" under the unambiguous language of Section 360. It has long been California law that payments by a principal obligor do not extend the limitation period applicable to any guarantor of that obligation for purposes of Section 360. *Martindell v. Bodrero,* 256 Cal. App. 2d 56, 62 (Cal. 2d Dist. 1967), as confirmed in PMH Supp Dec. ¶2.

Further, AMAG receives no assistance from CAL. CODE CIV. PROC. §360.5, permitting the waiver of the limitation period in the Autopsy Guaranty to extend the four-year limitation period of CAL. CODE CIV. PROC. §337 for four additional years "from the commencement of the running of the statute of limitation." The Autopsy Loan was made on May 27, 2007 and payment in full was due by its explicit terms, ¶3b [Frcek Dec. Ex. 27], eighteen months later, November 27, 2008. The Autopsy Guaranty was thus in default more than eight years prior to June 1, 2017, as confirmed in the PMH Supp. Dec. ¶3.

B. <u>Simulated Sale</u>. AMAG also fails to address the substance of Debtor's arguments regarding the Simulated Sale of the worthless SAE Preferred Stock. Debtor contends without dispute [SSUMF B6] that Mrs. Hoffman had no interest in acquiring the worthless SAE Preferred Stock and was forced to acquire it solely in order to obtain the AMAG Loan needed to save her home from foreclosure. As a result, the purchase price of the SAE Preferred Stock was nothing more than disguised usurious interest or compensation for the forbearance of collection of the

AMAG Loan.[4] This conclusion is confirmed by the failure of AMAG to even deliver the SAE Preferred Stock to Mrs. Hoffman as required by Nevada law and the SAE By-Laws [SSUMF B5].

AMAG's sole contention is that the SAE Preferred Stock was not in fact worthless, despite Mr. Markoff's statement to Mrs. Hoffman to that very effect [SSUMF B4]. AMAG relies on statements by Mr. and Mrs. Hoffman that they believed Seven Arts could relieve Mrs. Hoffman of this oppression and sell the SAE Preferred Stock to one of its bankers, who could convert the SAE Preferred Stock into SAE common stock with SAE's approval at a substantial lower conversion price than set forth in the SAE Preferred Stock and thereupon sell that common stock in the market.

As stated in Mr. Hoffman's Declaration ¶17 and Supp. Dec. ¶¶6-8, filed in Response to AMAG 56.1 Statement 18-20, such a revision of the SAE Preferred Stock did not render the SAE Preferred Stock of any value in AMAG's hands. In any event Mr. Hoffman's hopes were defeated because in fact the SAE Preferred Stock was worthless: those bankers considered SAE common stock unsaleable at that time (July 31, 2013 and the months leading up to Mr. Hoffman's indictment on February 6, 2014). It is and remains an undisputed issue of material fact that the SAE Preferred Stock was worthless when acquired by Mrs. Hoffman [SSUMF B3] as Mr. Markoff acknowledged at the time.

Finally, the three interlocking principles of Louisiana law that proscribe the Simulated Sale, as argued in Debtor's MSA, go far beyond the mere question of whether the SAE Preferred Stock might have had some nominal value when it was forcibly sold to Mrs. Hoffman as a condition to the AMAG Loan. Mrs. Hoffman would not have acquired the SAE Preferred Stock

---

[4] AMAG fails to grasp this issue by contending that the AMAG Loan default interest was only 18% and not otherwise in violation of LA. REV. STAT. ANN 9:3509(B). This is true only if the Simulated Sale is not disguised interest which it is.

no matter what its value because she had no interest in acquiring it or any other penny stocks owned by AMAG.

Mrs. Hoffman's purpose and objective in acquiring the SAE Preferred was solely to obtain the AMAG Loan and for no other reason. Hence no matter what its value, the purchase price of the SAE Preferred Stock was a simulation for additional usurious interest and not an acquisition of a penny stock in which Mrs. Hoffman had no interest at a time when she was in financial distress. As stated in the Debtor MSA, if the usury laws could be avoided by mere expedient of forcing purchase of unwanted property, with either no value or a nominal value, then the usury laws would be a dead letter indeed.

C. <u>Usurious Interest</u>. As stated in Debtor's MSA, AMAG's sole defense to Debtor's claim of usurious interest consists of the conclusory "representations" contained in the AMAG Loan and preliminary negotiations, as set forth in AMAG 56.1 Statement Nos. 2, 5, 10 and 11. AMAG claims there is no authority for the proposition that such conclusory "representations" are not sufficient to defeat a claim of usury. To the contrary, as discussed in Debtor's MSA (at 13, 20, 23) with many authorities therein cited, there is substantial authority that a usurious contract cannot be "confounded" by the "written instrument by which it is witnessed." Any other result would make a mockery of the usury law, as every personal loan could be deemed made for a business or commercial purpose through the mere expedient of a false conclusory "representation" in the applicable loan or note "confounded" by parol evidence.[5]

---

[5] Debtor emphasizes the exact words of Mr. Hoffman's "assurance" to AMAG on this issue (emphasis added): "I <u>believe</u> these are commercial purposes within <u>your intent</u>." AMAG 56.1 Statement No. 11. Mr. Hoffman refused to confirm that the purposes for the AMAG Loan he listed were for a business or commercial purpose <u>of Mrs. Hoffman</u>, which is the controlling issue. In any event, Mr. Hoffman's "belief" as a person not admitted to the practice of law in Louisiana is irrelevant to whether or not the AMAG Loan is or is not made of a business or commercial purpose

6

The Court is required under the authorities cited in Debtor's MSA to consider parol evidence of the real purpose of the AMAG Loan and in that context AMAG does not contest any of SSUMF C2 through 5. The Court need look no further than the specific purposes listed in the AMAG Loan, as quoted in AMAG 56.1 Statement No. 2, to ascertain the actual purposes of the AMAG Loan because those purposes are stated in explicit terms and those purposes are all a personal purpose to refinance Mrs. Hoffman's home and to remove clouds on her title to her home arising from matters in which she had no business involvement.

It is and remain an undisputed material fact, not controverted by AMAG, that the AMAG Loan was not for a business or commercial purpose. As stated in Debtor's MSA, it is AMAG's burden to show a business or commercial purpose for the AMAG Loan and its only evidence is, as a matter of law, irrelevant, a conclusory "representation" which has no legal effect. AMAG's recitation of the facts of *Spencer v. Boucher,* 587 So.2d 97, 100 (La. 2d Cir. 1991), inexplicably mis-cited in the AMAG MSJ, merely reconfirms the argument in the Debtor MSA: the critical facts are the obligor's stated intentions in seeking an extension of credit. In this case those intentions are stated in the AMAG Loan itself and state a personal purpose, saving Mrs. Hoffman's home from foreclosure, which is not a business or commercial purpose.

---

within the meaning of Louisiana law. Mr. Hoffman statement was cold comfort indeed as AMAG, a sophisticated lender, should have known.

Conclusion. Based on Debtor's MSA and this Opposition, Debtor respectfully requests this Court to deny the AMAG MSJ and to grant the Debtor's MSA.

DATED: September 18, 2020

**STILLMAN & ASSOCIATES**

By: _____
**PHILIP H. STILLMAN (#156861)**
3015 North Bay Rd., Ste. B
Miami Beach, Florida 33140
Telephone: (888) 235-4279
Email: pstillman@stillmanassociates.com

**CONGENI LAW FIRM, LLC**

*/s/ Leo D. Congeni*
By: _____
**LEO D. CONGENI (#25626)**
650 POYDRAS STREET, SUITE 2750
NEW ORLEANS, LOUISIANA 70130
Telephone: (504) 522-4848
Facsimile: (504) 910-3055
Email: leo@congenilawfirm.com

*Attorneys for Royal Alice Properties LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *DEBTOR ROYAL ALICE PROPERTIES LLC'S OPPOSITION TO DEFENDANT AMAG INC.'S MOTION FOR SUMMARY JUDGMENT* was filed on September 18, 2020, resulting in service via the Court's CM/ECF system as follows:

Leo D. Congeni on behalf of Plaintiff Royal Alice Properties, LLC
leo@congenilawfirm.com, michelle@congenilawfirm.com

John F. Kurtz, Jr on behalf of Defendant AMAG, Inc.
jkurtz@hawleytroxell.com

Richard W. Martinez on behalf of Defendant AMAG, Inc.
richard@rwmaplc.com, claire@rwmaplc.com

*/s/ Leo D. Congeni*

LEO D. CONGENI