## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE | * | **BANKR. NO. 19-12337** |
| | * | |
| **ROYAL ALICE PROPERTIES, LLC,** | * | **CHAPTER 11** |
| | * | |
| DEBTOR. | * | **SECTION "A"** |
| | * | |

*************************************  *************************************

| | | |
|---|---|---|
| **ROYAL ALICE PROPERTIES, LLC,** | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| **V.** | * | **ADVERSARY NO. 19-01133** |
| | * | |
| **AMAG, INC.,** | * | |
| | * | |
| DEFENDANT. | * | |

## MEMORANDUM OPINION AND ORDER

In September 2019, Royal Alice Properties, LLC (the "Debtor" or, prepetition, "Royal Alice") initiated the above-captioned adversary proceeding against AMAG, Inc. ("AMAG") to determine the extent, validity, and priority of AMAG's lien asserted on properties owned by the Debtor located at 900–902, 906, and 910–912 Royal Street in New Orleans, Louisiana (the "Property"). In its Complaint, the Debtor asserts that (i) the Interest[1] and Default Interest on the balance owed under the *Secured Promissory Note* (the "Note") and the *Loan Agreement* (the "Loan Agreement"), both dated July 31, 2013 (together, the "Loan Docs"),[2] is usurious and must be

---

[1] The Debtor defines "Interest" as the interest and loan discount charged pursuant to the Note. [ECF Doc. 1, ¶ 4].

[2] The Note incorporates the terms of the Loan Agreement:

This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set for the in the Loan Agreement entered into by Maker, and Payee as of the date of this Note (the "Loan Agreement"). This Note is secured by certain collateral, as evidenced by the Loan Documents, as that term is in the Loan Agreement, covering the real and personal property described therein. Capitalized terms used in this Note and not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

forfeited under applicable Louisiana law; (ii) the balance of $4.6 million claimed to be owed under the Loan Docs by AMAG (the "Loan Balance") should be discounted by $366,250.00, plus interest, representing the purchase price for a sale of worthless stock required by AMAG as a condition of executing the Loan Docs, a transaction which is null under applicable Louisiana law; and (iii) the Loan Balance should be credited in the amount of $392,779.75 (the "Foreclosure Credit"), representing the proceeds paid to Palm Finance Corporation ("Palm"), an affiliate of AMAG, upon the foreclosure sale of the Los Angeles home of Peter Hoffman, a guarantor of the Note and other debts owed to Palm.  [ECF Doc. 1].  AMAG filed an Answer denying those allegations.  [ECF Doc. 13].

In August 2020, AMAG and the Debtor filed cross-motions for summary judgment. Therefore, the Court considers here (i) AMAG's *Motion for Summary Judgment* and accompanying memorandum and affidavits in support, [ECF Docs. 51, 52, 81 & 88], which the Debtor opposed, [ECF Doc. 82], and AMAG's reply brief in support of its motion, [ECF Doc. 85]; and (ii) the Debtor's motion for summary judgment and accompanying memorandum in support, [ECF Docs. 56 & 59], which AMAG opposed, [ECF Doc. 78], and the Debtor's reply brief in support of its motion, [ECF Doc. 89].  AMAG and the Debtor submitted statements of uncontested facts, [ECF Docs. 53 & 59, respectively].  AMAG also filed *Objections and Motion To Strike Paragraphs of the Supplemental Declaration of Peter M. Hoffman in Opposition to Defendant AMAG Inc's Motion for Summary Judgment* ("Motion To Strike"), [ECF Doc. 86], to which the Debtor filed a response, [ECF Doc. 90], and AMAG filed a reply, [ECF Doc. 91].  Finally, the

---

[ECF Doc. 1, Ex. A, ¶ 1].  The Loan Agreement, in turn, incorporated (i) mortgages that were transferred by Whitney Bank to AMAG, as attached as Exhibit A to the Loan Agreement; (ii) the continuing personal guaranty given by Peter Hoffman securing repayment of the Loan to AMAG; and (iii) any other documents and agreements executed by Susan Hoffman and/or Royal Alice in connection with the Loan, including, but not limited to, the Stock Purchase Agreement (defined below).  [ECF Doc. 1, Ex. B, ¶ 1(b)].

Debtor filed a request for this Court to take judicial notice of certain documents filed in the property records of Los Angeles County, California (the "Judicial Notice Motion"), [ECF Doc. 58], which is unopposed.

For the following reasons, this Court (i) **GRANTS** summary judgment in favor of AMAG; (ii) **DENIES** summary judgment to the Debtor; (iii) **GRANTS IN PART AND DENIES IN PART** the Motion To Strike; and (iv) **GRANTS** the Judicial Notice Motion.[3]

## BACKGROUND

The Debtor is a Louisiana limited liability company that holds three real estate properties in the French Quarter neighborhood in New Orleans, Louisiana:  (a) 900–902 Royal Street; (b) 906 Royal Street, Unit E; and (c) 910–912 Royal Street, Unit C.  [No. 19-12337, ECF Doc. 2].  All three properties secure repayment of an obligation owed to AMAG, discussed herein.  [ECF Doc. 3].  The Debtor's income derives solely from leasing its three properties.

On July 31, 2013, AMAG and Susan Hoffman, individually and as the Managing Member of Royal Alice, executed the Loan Docs.  [ECF Doc. 1, Exs. A (Note) & B (Loan Agreement); ECF Doc. 53, ¶ 1 & *Declaration of Robert Frcek* ("Frcek Decl."), ¶ 5 & Ex. 1 (Loan Agreement with exhibits); ¶ 6 & Ex. 2 (Note); ¶ 14 & Ex. 10 (Stock Purchase Agreement)].  Under the Loan

---

[3]    Under the Federal Rules of Evidence, this Court may "take judicial notice of an 'adjudicative fact' if the fact is not subject to reasonable dispute in that it is (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned."  *Ferguson v. Extraco Mortg. Co*., 264 F. App'x 351, 352 (5th Cir. 2007).  Courts may take judicial notice of matters of public record.  *See Norris v. Hearst Tr*., 500 F.3d 454, 461 n.9 (5th Cir. 2007).  But this Court will not take judicial notice of or consider documents that are irrelevant.  *See Hoffman v. Bailey*, No. 13-5153, 2016 WL 409613, at *8, n. 111 (E.D. La. Feb. 3, 2016) (citing 21B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 5104 (2d ed.)).  The Judicial Notice Motion is unopposed; therefore, this Court grants the motion and will take judicial notice of the documents filed in the public property records of Los Angeles County, California, but only to the extent that this Court finds them to be relevant to resolving the cross-motions for summary judgment.  In resolving the cross-motions for summary judgment, the Court found Exhibits C and F to be relevant.

Docs, AMAG agreed to acquire the outstanding balance of loans totaling $1,860,901.60 owed by Susan and Peter Hoffman to Whitney Bank and the mortgages securing that debt, and also agreed to make "Additional Advances" to Susan Hoffman and Royal Alice in the principal amount of $3,166,000.00 (the "Loan").  *See* Loan Agreement, ¶ 1; Frcek Decl. ¶ 7 & Ex. 3.[4]  Those "Additional Advances," as defined in the Loan Agreement, consisted of funds advanced by AMAG that were to be used by the Hoffmans to accomplish three purposes:

(a) Susan Hoffman's purchase of 36,625 shares of Series A Convertible Exchangeable Preferred Stock of Seven Arts Entertainment, Inc. (the "Stock Purchase");

(b) To pay all other costs, expenses, and fees required pursuant to the execution of the Loan Agreement; and

(c) To allow Peter Hoffman to remove all liens and encumbrances, satisfy any judgments or order, and pay attorneys' fees associated with litigation against him in Louisiana and England.

*See* Loan Agreement, ¶ 1.  In exchange, the joint and several "Borrowers," Susan Hoffman and Royal Alice, agreed to repay the principal amount owed under the Loan Docs by the "Maturity Date" of July 13, 2016, plus 10% interest per annum for the first year and 12% interest for the last two years.  *See* Loan Agreement, ¶ 3; Note, at 1.  In the event of default, the interest rate provided for in the Note would increase to 18% per annum until the Borrowers cured the default.  *See* Loan Agreement, ¶ 3; Note, ¶ 3.

As one among other conditions of funding, Peter Hoffman executed a *Continuing Personal Guaranty* of repayment of the debt owed pursuant to the Loan Docs.  *See* Loan Agreement, ¶¶ 1–

---

[4]     The Note represented "a renewal of the promissory note from Susan H. Hoffman and Peter Hoffman dated April 3, 2007 in the original principal amount of $2,200,000.00 and the promissory note from Susan Hoffman and Peter Hoffman dated April 26, 2012 in the original principal amount of $648,863.19, as assigned to [AMAG] on July 31, 2013." Note, ¶ 12. Further, the Note provided: "This Note constitutes an extension, but not a novation, of the amount of the unpaid and continuing indebtedness, and all rights held by Payee under the earlier notes shall continue in full force and effect." *Id.*

2; Note, ¶ 8.  As expressly stated in the Loan Agreement:  "Borrowers warrant and represent that the Loan will be used exclusively for business and commercial purposes and is not being used for personal or household purposes."  Loan Agreement, ¶ 1.  Finally, the parties agreed that the Loan Agreement "shall in all respects be governed by and construed in accordance with the laws of Louisiana applicable to agreements executed and to be wholly performed within Louisiana."  Loan Agreement, ¶ 11.

On August 29, 2019, Royal Alice filed a petition for bankruptcy relief under chapter 11 of the Bankruptcy Code.  [No. 19-12337, ECF Doc. 1].  According to the Debtor, it "filed for relief under the Bankruptcy Code to stay an imminent foreclosure on its Real Estate Assets filed by AMAG."  [No. 19-12337, ECF Doc. 147, at 10–11].  AMAG filed a proof of claim against the Debtor's estate, alleging a secured claim in the amount of $4,623,618.26, exclusive of post-petition interest, fees, and costs.  [No. 19-12337, Proof of Claim No. 2].  On September 23, 2019, the Debtor initiated the above-captioned adversary proceeding challenging the amount owed to AMAG, leading to the cross-motions for summary judgment the Court considers here.

## JURISDICTION

This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a) and the Order of Reference of the District Court dated April 11, 1990.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K) & (O).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56(a) in adversary proceedings.  "A party seeking summary judgment must demonstrate the absence of

a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case." *Northshore Offshore Grp., LLC v. A&B Valve & Piping Sys., LLC (In re Northshore Offshore Grp., LLC)*, Adv. No. 17-3406, 2018 WL 5880949, at *2 (Bankr. S.D. Tex. Nov. 5, 2018) (citing *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009)).  "The standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Questions of contractual interpretation constitute legal, not factual, disputes which can be adjudicated in a motion for summary judgment.  *See Reliant Energy Servs., Inc. v. Enron Can. Corp.*, 349 F.3d 816, 821 (5th Cir. 2003) ("A determination of whether a contract is ambiguous and the interpretation of a contract are questions of law . . . ."). "In cases involving the interpretation of a contract, summary judgment is only appropriate where the language of the contract is unambiguous." *In re Northshore Offshore Grp., LLC*, 2018 WL 5880949, at *2 (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp.*, No. H-15-0576, 2016 WL 4939565, at *6 (S.D. Tex. Sept. 14, 2016)).

In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).  A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the

record, showing that the materials cited do not establish the presence or absence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. *See* FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When evaluating a declaration used to support a motion for summary judgment, the declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). But "[o]n summary judgment, evidence, to be considered, need not be offered in a form admissible at trial; it need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc*., 951 F.3d 219, 227 n.8 (5th Cir. 2020) (quoting FED. R. CIV. P. 56(c)(2)). If a party fails to properly support or refute an assertion of fact, the Court may consider the fact undisputed for purposes of resolving a summary judgment motion. *See* FED. R. CIV. P. 56(e).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Hydel Enters., Inc*., 783 F.3d 527, 536 (5th Cir. 2015) (internal quotations omitted). If the movant bears the burden of proof on an issue, a successful motion for summary judgment must present evidence entitling the movant to judgment at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

The parties here have filed cross-motions for summary judgment with respect to the validity, priority, or extent of AMAG's lien on the Debtor's Property. When both parties move for summary judgment in cross-motions, a court must rule on each party's motion on an individual and separate basis. *See White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370

(5th Cir. 2005). "If there is no genuine issue of material fact and one or the other party is entitled to prevail as a matter of law, a court will render judgment." *Standard Ins. Co. v. Corgill*, No. 3:13-CV-00997, 2013 WL 12101080, at *2 (N.D. Tex. July 23, 2013).

## DISCUSSION

### A. Evidentiary Objections

Rule 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "Affidavits, or portions thereof, may be stricken from the record if they fail to comport with the requirements of this rule, and more specifically, if they contain inadmissible hearsay, information not based on the personal knowledge of the affiant, or legal conclusions." *Meadaa v. K.A.P. Enters. LLC*, No. 09-CV-1211, 2010 WL 2195280, at *2 (W.D. La. May 26, 2010) (citing *In re Favre*, 342 F. App'x 5, 8 (5th Cir. 2009); *Gibson v. Liberty Mut. Grp.*, 129 F. App'x 94, 95 (5th Cir. 2005)).

In its Motion To Strike, AMAG asks this Court to strike paragraphs 2 through 9 of Peter Hoffman's declaration submitted in support of the Debtor's motion for summary judgment, and the Debtor opposes that request. The Court has reviewed those paragraphs and strikes paragraphs 2 and 3 to the extent that they make legal determinations regarding prescription of any claims on Hoffman's guaranty obligations under California law or legal interpretations of provisions in the California Code of Civil Procedure.

As to the remaining paragraphs, as discussed below, "when the terms of a contract are clear and unambiguous, testimonial or other evidence may not be admitted to vary or negate its terms." *First Nat'l Bank of Jefferson Parish v. Campo*, 537 So.2d 268, 270 (La. App. 4 Cir. 1988) (citing

LA. CIV. CODE arts. 1848, 2046). But "the parol evidence rule . . . is not really a rule of evidence but rather a substantive rule from the law of contracts." *Harville Rose Serv. v. Kellogg Co*., 448 F.2d 1346, 1349 (5th Cir. 1971). Therefore, the parol evidence rule may provide reason for the Court not to consider the Hoffman declaration in determining the meaning of the Loan Docs and other contracts governing the disputes at issue here. In that circumstance, the parol evidence rule renders the declaration immaterial, not inadmissible. *See, e.g*., *Tex. Assoc. of Sch. Bds., Inc. v. Travelers Cas. & Sur. Co. of Am*., No. 15-CV-369, 2016 WL 4257748, at *4 (W.D. Tex. July 7, 2016). For that reason, the Court declines to strike paragraphs 4 through 9 of the Hoffman declaration, and the exhibits associated therewith, from the record.

### B. Standard for Contractual Interpretation

"A court's overriding question when interpreting a contract is determining the parties' intent to give effect to their intentions." *In re Northshore Offshore Grp., LLC*, 2018 WL 5880949, at *5 (citing *Reliant Energy Servs., Inc. v. Enron Can. Corp*., 349 F.3d 816, 822 (5th Cir. 2003)). "To determine intent, [courts] look to the plain language of the contract, its commercial context, and its purposes." *Reliant Energy Servs., Inc*., 349 F.3d at 822 (citing *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981)). Contract interpretation begins by looking to the "four corners" of the contract, followed by consideration of extrinsic evidence only if the contract is ambiguous. *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *see also Reliant Energy Servs., Inc.,* 349 F.3d at 822 ("When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written." (citation omitted)). Indeed, "[w]hen the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties['] intent within the four corners of the document."

*Pellerin Constr., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 578 (E.D. La. 2001) (citing LA. CIV. CODE arts. 1848, 2046).

A contract "is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction." *Dean*, 438 F.3d at 460–61 (quoting *N. Shore Lab. Corp. v. Cohen*, 721 F.2d 514, 519 (5th Cir. 1983)). "The mere fact that the parties may disagree on the meaning of a contractual provision is not enough to constitute ambiguity." *Reliant Energy Servs., Inc.*, 349 F.3d at 822. And "a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Transnational Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000).

### C.  Choice of Law

In its Complaint, the Debtor seeks an Order declaring that (1) the Interest and the Default Interest charged pursuant to the Loan Docs are usurious and must be forfeited under Louisiana law; (2) the Stock Purchase required under the Loan Docs is voidable for lack of consent or is a simulation under Louisiana law; and (3) AMAG must reduce the Loan Balance in the amount of the Foreclosure Credit.  [ECF Doc. 1].  Each party moves for summary judgment in its favor on each of those claims.  Initially, this Court must determine the substantive state law to apply to resolve each claim.

When resolving state law claims that do not implicate federal policy, bankruptcy courts apply the choice-of-law rules of the forum in which they sit.  *See ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 60–61 (S.D. Tex. 2007) (citations omitted).  Therefore, this Court applies Louisiana's choice-of-law rules found in the Louisiana Civil Code.

### 1.  *Choice of law for the parties' dispute regarding usurious interest*

Although the parties do not brief it, both appear to accept that Louisiana law applies to determine whether the Interest and Default Interest charged under the Loan Docs are usurious. [ECF Doc. 52, at 7–15; ECF Doc. 59, at 16–23].  Article 3537 of the Louisiana Civil Code provides the general choice-of-law rule in the absence of a contractual choice-of-law clause:  "Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."  Article 3540 of the Louisiana Civil Code governing "Party autonomy" supplies choice-of-law doctrine when parties have agreed to a choice-of-law rule:  "All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."

The Loan Agreement states that it "shall in all respects be governed by and construed in accordance with the laws of Louisiana."  Loan Agreement, ¶ 11.  Because the parties have agreed to apply Louisiana law to construe the Loan Docs, this Court will apply Louisiana law unless doing so would seriously impair the public policy of the state whose law would otherwise be applicable under article 3537.  The Court concludes that, even in the absence of a choice-of-law provision, Louisiana law would be applicable here under article 3537.  Pursuant to article 3537, applicable state law

> is determined by evaluating the strength and pertinence of the relevant policies of the involved states in light of:  (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate

11

commercial intercourse, and of protecting one party from undue imposition by the other.

LA. CIV. CODE. art. 3537.[5]

The relevant facts in this case point toward the application of Louisiana law.  Although AMAG is domiciled in California and payments under the Loan Docs were due in California, Susan Hoffman and Royal Alice are domiciled in Louisiana, the collateral securing repayment under the Loan Docs is located in Louisiana, and the parties agreed that disputes arising under the Loan Docs would be decided in Louisiana.  *See* Note, at 1 & ¶ 9; Loan Agreement, at 1 & ¶¶ 6, 12.  Under articles 3515 and 3537, Louisiana's policies would be most seriously impaired if its law were not followed.  Further, the parties contractually agreed that Louisiana law would apply to disputes arising under the Loan Docs, and Louisiana law honors such choice-of-law provisions. *See Delhomme Indus., Inc. v. Houston Beechcraft, Inc*, 669 F.2d 1049, 1058 (5th Cir. 1982) (citation omitted).

> 2.   *Choice of law for the parties' dispute regarding whether the Stock Purchase as a component of the Loan transaction is null*

The Debtor asserts in its Complaint and motion for summary judgment that AMAG "forced" Susan Hoffman to purchase worthless stock as a condition of obtaining the Loan and incorporated the Stock Purchase into the Loan Docs.  [ECF Doc. 1, ¶¶ 14–23 (alleging that Susan was under "economic duress" and "forced" to purchase the stock); ECF Doc. 59, at 9 (referring to

---

[5]      Article 3515 provides that applicable state law

> is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of:  (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

LA. CIV. CODE. art. 3515.

the Stock Purchase as a simulation under Louisiana law and AMAG's burden to overcome a demonstration that a vice of consent exists)].  Although the parties contractually chose Louisiana law to govern and apply to disputes arising from the Loan Docs, article 3540 does not apply to issues of capacity and form.  *See* LA. CIV. CODE art. 3540 cmts. (a) & (d).  Article 3539 governing "Capacity" states that "[a] person is capable of contracting if he possesses that capacity under the law of either the state in which he is domiciled at the time of making the contract or the state whose law is applicable to the contract under Article 3537."  This Court would apply Louisiana law nonetheless to decide this issue, as Susan Hoffman was domiciled in Louisiana at the time of making the contract and, therefore, Louisiana law applies here under an article 3537 choice-of-law analysis as discussed above.

        *3.   Choice of law for the parties' dispute regarding application of the Foreclosure Credit*

        a.   The Hoffmans' personal guaranties of loans to non-Debtor affiliates

The Debtor asserts in its Complaint and in its motion for summary judgment that the Foreclosure Credit should have been applied to the Loan Balance owed to AMAG.  [ECF Doc. 1, ¶¶ 24–26; ECF Doc. 59, at 14–16].

In March 2003, Palm—not AMAG—loaned $1.5 million ("Movie Loan No. 1") to three entities affiliated with the Debtor through the Hoffmans:  Cinevisions, Seven Arts Pictures, Inc., and Seven Arts Pictures Ltd.  *See* Frcek Decl., ¶ 21 & Ex. 17.  Repayment of the principal and interest of Movie Loan No. 1 was due by July 31, 2003.  *See* Frcek Decl., Ex. 17, ¶ 3.  A few months later, in July 2003, Palm—not AMAG—loaned another $1.2 million to those three non-Debtor affiliates, plus Asylum Productions Ltd., also affiliated with the Debtor through the Hoffmans ("Movie Loan No. 2").  *See* Frcek Decl., ¶ 23 & Ex. 19.  Repayment of the principal and interest of Movie Loan No. 2 was due by the earlier of the start of photography for the movie

"Asylum" or November 28, 2003. *See* Frcek Dec, Ex. 19, ¶ 3. The Hoffmans guaranteed repayment of both of those loans (the "Movie Loan Guaranties"). *See* Frcek Decl., ¶¶ 22 & 24 & Exs. 18 & 20.

Each Movie Loan Guaranty included a choice-of-law provision designating California law to apply to "any disputes arising out of or related to this Agreement." *See* Frcek Decl., Ex. 18, ¶ 11 & Ex. 20, ¶ 11. And each guaranty contained the following term:

> Guarantors authorize Palm . . . without notice or demand (except as shall be required by applicable statutes and cannot be waived), and without affecting or impairing their liability hereunder, from time to time to (a) renew, compromise, extend, increase, accelerate, or otherwise change the time for payment of, or otherwise change the terms of the indebtedness or any part thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this Continuing Personal Guaranty or the indebtedness and exchange, enforce, waive, and release any such security; (c) apply such security and direct the order or manner of sale thereof as Palm in its discretion may determine; and (d) release, settle, or substitute any one or more endorsers, Guarantors, Borrower, or other obligors.

Frcek Decl., Ex. 18, ¶ 4 & Ex. 20, ¶ 4.

As of September 20, 2003, both Movie Loan No. 1 and No. 2 were due and payable to Palm. *See* Frcek Decl., ¶ 25 & Ex. 21, at 1. The obligor non-Debtor affiliates and the Hoffmans as guarantors strived to obtain partial third-party refinancing alternatives, but, in the meantime, entered into a *Loan Modification Agreement* effective September 30, 2003, to rework the terms of Movie Loan No. 1 and No. 2. *See* Frcek Decl., Ex. 21, at 1. The *Loan Modification Agreement* contained the following alternative terms, depending on whether partial third-party refinancing was obtained by the obligors and guarantors:

> 2.1    Payment Upon Completion of Take-Out Loan. In the event that [obligors] are successful in obtaining the Take-Out Loan, Seven Arts shall direct that all amounts received from that loan be paid directly to Palm by wire transfer by the third party making the Take-Out Loan in accordance with Palm's instructions prior to November 30, 2003. The amount received by Palm from that Take-Out Loan shall not be less than $1.5 million. In exchange for that payment,

14

Palm will assign its security interest in [the movie] "No Good Deed" to the third party lender in a form of agreement acceptable to Palm. In the event the payment of $1.5 million from the Take-Out Loan is received by Palm on or before November 30, 2003, the remaining balances owed on [Movie] Loan No. 1 and [Movie] Loan No. 2 shall be paid on or before March 31, 2004.

      2.2   <u>Alternative Payment Schedule and Reduction in Amounts Owed</u>. In the event that Palm is not paid $1.5 million on or before November 30, 2003 as contemplated in Paragraph 2.1 above, Seven Arts shall pay to Palm: (1) the amount of $750,000 on or before December 31, 2003, (2) the amount of $750,000 on or before March 31, 2004 and (3) all remaining amounts owed on or before June 30, 2004. In the event that Seven Arts and Hoffman comply with all of the terms of this Agreement, Palm agrees that it will reduce the amount owed as of September 30, 2003 of [Movie] Loan No. 1 from $1,678,033.53 to $1,675,000 as of September 30, 2003 and will reduce the amount owed as of September 30, 2003 on [Movie] Loan No. 2 from $1,549,790 to $1,540,000 as of September 30, 2003. The reductions shall be treated as a reduction in interest.

Frcek Decl., Ex. 21, ¶¶ 2.1 & 2.2. The Loan Modification Agreement required the Hoffmans to execute a Deed of Trust in Palm's favor, pledging Peter Hoffman's residence located at 1643 Queens Road in Los Angeles, California (the "<u>Queens Road Property</u>") as collateral to secure their Movie Loan Guaranties. *See* Frcek Decl., Ex. 21, ¶ 2.3. In November 2003, the Hoffmans granted that Deed of Trust to Palm. *See* Frcek Decl., ¶ 26 & Ex. 22; [ECF Doc. 58, Ex. C]. According to the Loan Modification Agreement, "[i]f Palm receives a payment of at least $1.5 million from the Take-Out Loan as contemplated in Paragraph 2.1 above, Palm shall return the Residence Deed of Trust to Hoffman." Frcek Decl., Ex. 21, ¶ 2.3.[6]

By October 2005, no payments had been made to Palm by the obligors or under the Movie Loan Guaranties, as modified by the September 2003 Loan Modification Agreement. *See* Frcek Decl., ¶ 27 & Ex. 23, at 1. Palm agreed to accept additional collateral and to extend the maturity

---

[6]     As of September 30, 2003, "the only encumbrance against the Queens Road Property is a Deed of Trust in favor of Washington Mutual Bank recorded on July 21, 2003 . . . ." Frcek Decl., Ex. 21, ¶ 2.3. Peter Hoffman was also required to grant a Deed of Trust on his separate property located at 10960 Wellworth Avenue, No. 302, in Los Angeles, California to secure his guaranty on Movie Loans No. 1 and No. 2. *See* Frcek Decl., Ex. 21, ¶ 2.4.

dates for Movie Loan No. 1 and No. 2 until December 31, 2005.  *See* Frcek Decl., ¶ 27 & Ex. 23, ¶¶ 2.1 & 2.2.  In February 2006, the Hoffmans secured partial third-party financing of the debts owed under Movie Loan No. 1 and No. 2 and executed an agreement with Palm, whereby Palm would assign certain rights to payment under the Movie Loan documents to Arrowhead Target Fund, Ltd. ("Arrowhead"), in exchange for Arrowhead's payment of $3.5 million to Palm by February 15, 2006.  *See* Frcek Decl., ¶ 28 & Ex. 24, at 1.  Pursuant to the Movie Loan Guaranties, Peter Hoffman would continue to remain personally liable to Palm for $593,389.00, representing the amount owed under Movie Loan No. 1 and No. 2 after application of Arrowhead's $3.5 million and Palm's forgiveness of interest that would have accrued on the debt in January 2006.  *See* Frcek Decl., Ex. 24, at 1.

On February 14, 2006, Palm, the obligors and guarantors on Movie Loan No. 1 and No. 2, and Arrowhead executed the Assignment of Loan Documents, transferring the majority of the debt and the collateral securing that portion of the debt to Arrowhead.  *See* Frcek Decl., ¶ 29 & Ex. 25. Importantly, Palm did not transfer the Queens Road Property Deed of Trust to Arrowhead.  *See id.* Rather, on February 15, 2006, Palm loaned the Hoffmans $601,347.60, evidenced by the Secured Promissory Note executed by the Hoffmans, which was also secured by the November 2003 Queens Road Property Deed of Trust.  *See* Frcek Decl. ¶ 30 & Ex. 26, ¶ 8.

On May 7, 2007, Palm loaned $5.5 million (the "Autopsy Loan") to New Moon Pictures, LLC, Pool Boy The Movie, LLC, and Autopsy, LLC, all affiliates of the Debtor through Peter Hoffman.  *See* Frcek Decl., ¶ 31 & Ex. 27.  On January 8, 2009, Peter Hoffman individually guaranteed repayment of that loan as well (the "Autopsy Guaranty").  *See* Frcek Decl., ¶ 32 & Ex. 28.  The parties contractually selected California law to govern any disputes arising from the Autopsy Guaranty.  *See* Frcek Decl., Ex. 28, ¶ 11.

16

During November 2010 and October 2011, Palm executed *Forbearance and Workout Agreements* with the Autopsy Loan obligors and guarantors, including Peter Hoffman, to reaffirm loan documents, balances, and obligations. *See* Frcek Decl., ¶¶ 33–34 & Exs. 29–30. Germane here, those *Forbearance and Workout Agreements* left Hoffman's guaranties intact and required the following condition of forbearance:

> The Deed of Trust, recorded in Los Angeles County, California on December 18, 2003 as Instrument No. 03 3736332, encumbering the real property located at 1643 Queens Road, Los Angeles, California ("Queen's Road Property") shall remain in full force and effect and shall be security for the Hoffman Guaranty and all other guaranties from Hoffman regarding amounts owed to Lender ("Hoffman Guaranties"). In the event, that Deed of Trust has been reconveyed or otherwise is no longer and encumbrance against the Queens Road Property, Hoffman agrees to execute another Deed of Trust on Queens Road Property to secure payment of the Hoffman Guaranties in a form of Deed of Trust acceptable to Lender and to make any modifications or amendments to the Deed of Trustee reasonably requested by Lender to perfect the Deed of Trust in favor of Lender.

Frcek Decl., Ex. 29, ¶ 2(z) & Ex. 30, ¶ 3(x). The parties contractually chose California law to govern any disputes arising from the *Forbearance and Workout Agreements*. Frcek Decl., Ex. 29, ¶ 14 & Ex. 30, ¶ 15.

On August 1, 2016, the Hoffmans executed a second Deed of Trust, pledging the Queens Road Property to Palm to secure

> i) a Continuing Personal Guaranty, which guaranties payment of a Secured Promissory note dated May 7, 2007 in the original principal amount of $5,500,000.00, plus all other amounts owed; and ii) a Continuing Personal Guaranty which guaranties payment of a Secured Promissory Note dated December 17, 2007, in the original principal amount of $4,000,000.00, plus all other amounts owed.

Frcek Decl. ¶ 35 & Ex. 31, at 1; [ECF Doc. 58, Ex. F].

      b.  California law governs disputes arising from the Hoffmans' guaranties
         of loans to non-Debtor affiliates

Although neither party briefed in detail the choice-of-law issue as it pertains to how the Foreclosure Credit should be applied, they disagree on which state's law applies.  AMAG asserts that California law applies.  [ECF Doc. 52, at 23–26].  The Debtor asserts that Louisiana law governs.  [ECF Doc. 59, at 2, 6–9].

Palm and the Hoffmans—the parties to the guaranties—contractually agreed that California law would govern all disputes arising from both the Movie Loan Guaranties and the Autopsy Guaranty.  *See* Frcek Decl., Ex. 18, ¶ 11 & Ex. 20, ¶ 11, Ex. 28, ¶ 11.  Under the analysis of Louisiana choice-of-law rules found in articles 3537 and 3540 of the Louisiana Civil Code discussed above, because the parties have agreed to apply California law to construe the Movie Loan Guaranties and the Autopsy Guaranty, this Court will apply California law unless doing so would seriously impair the public policy of the state whose law would otherwise be applicable under article 3537.

The Court concludes that, even in the absence of a contractual choice-of-law provision, California law would be applicable here under article 3537.  Although Susan Hoffman has always been domiciled in Louisiana, Peter Hoffman is domiciled in California, payments under the guaranties were due in California, the collateral pledged to secure the guaranties—specifically the Queen Road Property—is located in California, and the parties agreed that disputes arising under the guaranties would be decided in California.  *See* Frcek Decl., Exs. 18, 20, & 28.  Under that analysis, California's policies would be most seriously impaired if its law were not followed.  Further, the parties contractually agreed that California law would apply to disputes arising under the Movie Loan Guaranties and the Autopsy Guaranty and, as observed above, Louisiana law

honors such choice-of-law provisions. *See Delhomme Indus., Inc. v. Houston Beechcraft, Inc*, 669

F.2d 1049, 1058 (5th Cir. 1982) (citation omitted).[7]

### D. The Interest and Default Interest Charged Pursuant to the Loan Docs Are Not Usurious Under Louisiana Law

Moving to a substantive analysis of the Debtor's claims, section 9:3500 of the Louisiana

Revised Statutes provides that conventional interest cannot exceed 12% per annum. *See* LA. REV.

STAT. ANN. § 9:3500(C)(1). But that ceiling does not apply to "a loan made for commercial or

business purposes or deferring payment of an obligation for commercial or business purposes."

*See* LA. REV. STAT. ANN. § 9:3500(D). Further, Louisiana law provides:

> Notwithstanding any other provisions of the law of this state to the contrary, any debtor that is . . . a limited liability company formed pursuant to the laws of this state . . . borrowing funds for commercial, business, or agricultural purposes . . . may agree to pay interest in excess of the maximum rate of conventional interest authorized by the laws of this state . . . and as to any such agreement such debtor shall be prohibited from asserting a claim or defense of usury or the taking of interest in excess of the maximum rate of conventional interest, and any person whatsoever signing as co-maker, guarantor, or endorser for such debtor shall also be prohibited from asserting any such claim or defense. . . . .

LA. REV. STAT. ANN. § 9:3509(A).

---

[7]     As stated, neither AMAG nor the Debtor provided in any detail a choice-of-law analysis. In its reply brief and its opposition to AMAG's motion for summary judgment, the Debtor cites to a Louisiana statute allowing obligees the right to "impute payment to the debt he intends to pay," but gives no indication as to why the parties' contractual choice-of-law provisions in the Movie Loan Guaranties and the Autopsy Loan do not apply here to determine how proceeds of collateral securing those guaranties are applied. [ECF Doc. 89, at 2–4; ECF Doc. 82, at 2–3]. The Debtor summarily states in its motion for summary judgment that "AMAG and Palm were a single business enterprise owned and controlled by Steven Markoff," [ECF Doc. 57, ¶ 12 & 59, ¶ 12], and sprinkles that theory again in its opposition to AMAG's motion for summary judgment, [ECF Doc. 82, at 2–3]. But it fails to explain why that statement, if true, would matter in the choice-of-law analysis. More importantly, the Debtor did not plead a theory of single-business-enterprise in its Complaint and did not move to amend its Complaint to add that theory; therefore, it will not be able to use its dispositive motion as a means to amend its Complaint. *See Williams v. MTA Bus Co.*, No. 17-CV-7687, 2020 WL 192911, at *9–10 (S.D.N.Y. Apr. 20, 2020). Moreover, even if this Court were to consider and apply the Debtor's bare allegation of single-business-enterprise theory to AMAG and Palm's business operations, the Court's choice-of-law analysis above would not be disturbed based on the record here.

19

The Note expressly provides that Interest on the outstanding principal balance on the Note shall be calculated at 10% per annum for the first two years and would increase thereafter to 12% per annum.  *See* Note, at 1.  The Note instructs the Borrowers, Susan Hoffman and Royal Alice, exactly how Interest would be calculated:

> Said interest will be calculated based on a 365-day year, for the exact number of days, said principal is outstanding on this Note.  The aforesaid interest rate is subject to increase as set forth below.  Payee may send Maker notice of interest due under this Note, provided that the failure to send such notice or any inaccuracy therein shall not affect the obligation of Maker under this Note.

Note, at 1.  The Note also expressly identifies Default Interest to accrue at 18% per annum, with instructions on how Default Interest would be calculated:

> Upon default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum ("**Default Rate**"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee.  Until cured, interest shall accrue daily after default with accrued interest being added to principal at end of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and the costs, in addition to the payment of principal, interest and any other amount.

Note, at 2 & ¶ 3.

The Loan Agreement, the terms of which are incorporated into the Note, *see* Note, ¶ 1, expressly reveals the purposes of the Loan:

> Lender has acquired the outstanding balance of loans owed by Susan H. Hoffman and Peter Hoffman to Whitney Bank, the successor-in-interest to Hancock Bank of Louisiana, and Lender has been induced by Borrowers to (i) amend the terms of such existing loans and (ii) to make additional loans to Borrower all as described hereunder, in an aggregate amount not to exceed the principal amount of $3,166,000.00 (the "**Loan**") to Borrowers, with such additional lending to be exclusively for the following purposes:  (i) providing funds for Susan H. Hoffman to purchase 36,625 shares of Series A Convertible Exchangeable Preferred Stock of Seven Arts Entertainment, Inc. ("**Stock Purchase**"), and all other costs, expenses and fees required pursuant to this Agreement (collectively the "**Initial Advance**").  Lender has also agreed to provide additional advances, subject to the

> conditions set forth in this Agreement, to allow the Borrowers to obtain the removal of all liens, encumbrances, notices of lis pendens, judgments, orders and adverse filings, if any, currently being pursued by Jonesfilm against the property owned by Borrowers in the state of Louisiana and to provide funds to pay attorney fees, cost and other expenses to pursue certain litigation currently pending in England (**"Content Litigation"**), which additional advances are referred to in this Agreement as **"Additional Advances"**.

*See* Loan Agreement, ¶ 1.  Indeed, the plain, unambiguous text of the Loan Agreement states: "Borrowers warrant and represent that the Loan will be used exclusively for business and commercial purposes and is not being used for personal or household purposes." *Id*.

As explained above, this Court's examination into whether the Loan was made for business purposes, which, in turn, will inform whether Interest or Default Interest is usurious, begins with the "four corners" of the Loan Docs, followed by consideration of extrinsic evidence *only* if the contract is ambiguous.  *See Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *Reliant Energy Servs., Inc., . v. Enron Can. Corp.*, 349 F.3d 816, 822 (5th Cir. 2003) ("When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written." (citation omitted)).  Here, the Court finds that the express purposes of the Loan are expressly and unambiguously identified in the Loan Docs drafted and executed by the parties and constitute business purposes.  Therefore, this Court is prohibited from delving into extrinsic evidence for a determination of the parties' intent.  *See Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 190 (5th Cir. 2019).  To be clear, "[p]arol evidence . . . may not be used to create an ambiguity in an otherwise unambiguous contract."  *Id.* (citation omitted).

Because the Court finds that the Loan was made for commercial or business purposes, the "business purposes" exception provided by sections 9:3500(D) and 3509(A) of the Louisiana Revised Statutes to the 12% cap on conventional interest mandated by section 9:3500(C)(1) applies.  The Court, therefore, finds that the Interest and Default Interest charged under the Loan

Docs are not usurious. The Court grants summary judgment in favor of AMAG and denies summary judgment to the Debtor to the extent the Complaint asks this Court for a declaratory judgment that the Interest and Default Interest charged under the Loan Docs are usurious.

### E. The Stock Purchase Is Enforceable as a Term of the Loan Docs

In its Complaint, the Debtor alleges that AMAG "forced" Susan Hoffman, who "was under economic duress," to purchase worthless stock as a condition of obtaining the Loan and incorporated that Stock Purchase into the Loan Docs. [ECF Doc. 1, ¶¶ 14–23]. The Debtor also asserts that the Stock Purchase constitutes a simulated sale and is null under Louisiana law. Prevailing on either argument would result in a reduction in the Loan Balance by the amount of the price of the Stock Purchase, or $366,250.00. [ECF Doc. 1, ¶¶ 22–23].

On July 31, 2013, Susan Hoffman and AMAG executed the *Stock Purchase Agreement* ("Stock Purchase Agreement"), memorializing the terms of the Stock Purchase. *See* Frcek Decl., ¶ 14 & Ex. 10. The Stock Purchase Agreement is incorporated into the Loan Docs. *See* Loan Agreement, ¶ 1(b). Among other representations and warranties as the Buyer, Susan Hoffman warranted:

> Buyer has reviewed and understands the Certificate and the Investor Rights Agreement. Buyer has reviewed Company's [Seven Arts Entertainment, Inc.'s] filings with the United States Securities and Exchange Commission and has conducted such due diligence and made such inquiry of the Company and her representatives as she has deemed necessary and has been furnished all materials relating to Company, its business and financial condition, the Shares, and any other matters which she has requested and has been afforded by the Company the opportunity to ask questions and receive answers concerning the Company and the Shares; and the Company has answered all inquiries that Buyer has made of it concerning Company, its business and financial condition, or any other matter relating to the operation of Company and the rights, privileges, limitations and value of the Shares.

Stock Purchase Agreement, ¶ 5(g). Susan Hoffman also warranted that she "has not received, and is not relying on, any information received from Seller relating to the Company, its business,

financial condition, results of operations or other information pertinent to the valuation of the

Shares." Stock Purchase Agreement, ¶ 5(h).  Susan Hoffman further acknowledged that she

> has participated in pre-existing business relationships between the Company and Seller and has such knowledge and experience in business and financial matters as to enable her to utilize the information made available to her by the Company, to protect her own interests, to evaluate the merits and risks of her investment in the Shares, and to make an informed investment decision with respect thereto.

Stock Purchase Agreement, ¶ 5(j).  Finally, Susan Hoffman warranted that she

> (i) has adequate means of providing for her current needs and possible personal contingencies, (ii) has no need for liquidity in her investment in the Shares, (iii) is able to bear the economic risks of her investment in the shares, and (iv) at the present time, can afford a complete loss of such investment.

Stock Purchase Agreement, ¶ 5(k).  Despite those clear, unambiguous representations and

warranties regarding Susan Hoffman's consent to enter into the Stock Purchase Agreement, the

Debtor now seeks to avoid the consequences of the Stock Purchase by arguing that Susan was

under economic duress at the time she executed the Stock Purchase Agreement and the Loan

Agreement and that AMAG "forced" her to purchase worthless stock.  [ECF Doc. 1, ¶¶ 14–23;

ECF Doc. 59, at 9–11].

"Under Louisiana law, duress is sufficient to vitiate a party's consent when it is of such a

nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property,

or reputation." *Pellerin Constr., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 579 (E.D. La. 2001)

(citing LA. CIV. CODE arts. 1927, 1959).  "Duress results when 'a person makes an improper threat

that induces a party who has no reasonable alternative to manifest his assent.'" *Wolf v. La. State

Racing Comm'n*, 545 So. 2d 976, 980 (La. 1989) (quoting LA. CIV. CODE. art. 1959 cmt. (b)).  "The

result of this type of duress is that the contract that is created is voidable by the victim." *Id.*

(quoting LA. CIV. CODE. art. 1959 cmt. (b)).

"The mere stress of business conditions, however, does not constitute economic duress if the opposing party did not engage in conduct designed to produce that stress." *Pellerin Constr., Inc.*, 169 F. Supp. 2d at 579 (citing *Utley-James of La., Inc. v. La. Dept. of Facility Planning & Control*, 593 So. 2d 1261, 1268 (La. App. 1st Cir. 1991); *Averette v. Indus. Concepts, Inc.*, 673 So. 2d 642, 644 (La. App. 1st Cir. 1996)). The record before the Court contains no allegations or evidence that AMAG improperly threatened Susan Hoffman or caused any economic duress that Susan Hoffman may have felt at the time she entered into the Stock Purchase Agreement, the Note, or the Loan Agreement. In fact, the Debtor attributes Susan's economic duress to the facts that "Whitney [Bank] had threatened to accelerate the mortgages and foreclose on Mrs. Hoffman's personal residence and [the Debtor's] investment property," and she "was not able to obtain conventional mortgage financing at that time because of a then ongoing investigation by the United States Attorney's Office." [ECF Doc. 1, ¶ 20].

The Court finds that the Stock Purchase Agreement and the Loan Agreement are not only enforceable, but they also unambiguously detail the representations and warranties offered by Susan Hoffman regarding her knowledge of the transaction and the due diligence she performed in assessing the Stock Purchase. This Court, therefore, is prohibited from looking to parol evidence regarding what the parties understood regarding the value of the stock at the time of purchase to determine whether the transaction is a simulation under Louisiana law. *See Abshire v. Vermilion Parish Sch. Bd.*, 848 So. 2d 552, 555 n.5 (La. 2003) ("Meaning and intent of parties to a written instrument is ordinarily determined from instrument's four corners and extrinsic evidence is inadmissible either to explain or to contradict instrument's terms." (citation omitted)).

For those reasons, the Court grants summary judgment in favor of AMAG and denies summary judgment to the Debtor to the extent the Complaint asks this Court for a declaratory

judgment that the Stock Purchase is unenforceable and null as a result of the presence of a vice of consent or as a simulation.

**F.  Palm Acted Within Its Rights To Apply the Foreclosure Credit to the Debt Owed to It Under the Autopsy Loan**

In October 2016, the first-position lien holder on Peter Hoffman's Queens Road Property foreclosed on that property.  The sale proceeds exceeded the amount owed to that creditor and, therefore, on or about June 1, 2017, Palm received the surplus funds in the amount of $392,779.74 and applied that Foreclosure Credit to the debt owed to it under the Autopsy Loan.  *See* Frcek Decl., ¶¶ 36–37; [ECF Doc. 57, ¶¶ 2, 9].  The Debtor asserts here that AMAG should have applied the Foreclosure Credit to the Loan Balance instead.

In support of its position, the Debtor advances several arguments under Louisiana law regarding a debtor's right to impute payment across multiple debts owed to the same creditor and the order of priority of imputation. [ECF Doc. 59, at 14–15].  This Court has determined, however, that California law applies to this issue, not Louisiana law.  But regardless of which state's law regarding multiple debts owed to a single creditor applies, that argument nevertheless falls flat because Peter Hoffman did not owe multiple debts in this instance to the same creditor.  Peter Hoffman guaranteed debts owed separately to Palm and AMAG.  The Court has declined to consider the Debtor's argument that Palm and AMAG function as the same entity or single business enterprise for purposes of summary judgment on the issue of whether AMAG was obligated to impute the Foreclosure Credit to the debt owed under the Loan Docs.  *See supra* Subpart C.3.

The Debtor next asserts that Peter Hoffman settled the debt owed to Palm via an August 2014 Loan Workout Agreement, thereby cancelling the Autopsy Guaranty, so that any payments received by Palm should have been credited against the AMAG Loan Balance.  [ECF Doc. 82, at

3].  In August 2014, Palm and obligors/guarantors Seven Arts Entertainment, Inc., and Seven Arts

Filmed Entertainment Louisiana, LLC, entered into a *Loan Workout Agreement*, whereby those

parties settled and released some claims among them.  *See* Declaration of Robert Frcek No. 3

("Frcek Decl. No. 3"), ¶ 3 & Ex. 1.   The plain language of that agreement states that "[t]he

Agreement is made and entered into solely for the benefit of the SAE, SAFELA and Palm.  Nothing

contained in this Agreement shall in any way affect Palm's rights with respect to any person or

entity not a party to this Agreement."  Frcek Decl. No. 3, Ex. 1, ¶ 13.  Although Peter Hoffman

signed the August 2014 *Loan Workout Agreement* as General Counsel of Seven Arts

Entertainment, Inc., and Seven Arts Filmed Entertainment Louisiana, LLC, Peter Hoffman in his

individual capacity is not a party to that agreement.  *See id.*  Therefore, the unambiguous text of

that agreement reveals the true intent of the parties and contradicts the Debtor's assertion that

Hoffman's Autopsy Guaranty was cancelled by that agreement.  Because the August 2014 *Loan

Workout Agreement* is unambiguous, the Court cannot examine parol evidence regarding the intent

of the parties in executing the document.

Finally, the Debtor asserts that the debt owed to Palm by Peter Hoffman under the Autopsy

Guaranty had prescribed by June 1, 2017; therefore, he had the right to direct that the Foreclosure

Credit be applied to the debt owed to AMAG under his guaranty of that debt.  [ECF Doc. 59, at

15; ECF Doc. 1, ¶ 26].  California law designates the statute of limitations for "[a]n action upon

any contract, obligation or liability founded upon an instrument in writing" to be four years.  CAL.

CIV. PROC. § 337.  "As a general rule, part payment of a debt or obligation is sufficient to extend

the bar of the statute."  *Lazar v. Energy Unlimited, Inc.*, No. 07-887, 2009 WL 10673759, at *3

(C.D. Cal. Mar. 30, 2009) (quoting *Martindell v. Bodrero*, 63 Cal. Rptr. 774, 776 (Cal. Ct. App.

1967)); *see also* CAL. CIV. PROC. § 360.  "The theory on which this is based is that the payment is

an acknowledgement of the existence of the indebtedness which raises an implied promise to continue the obligation and to pay the balance." *Martindell*, 63 Cal. Rptr. at 776.

In its opposition to AMAG's motion for summary judgment, [ECF Doc. 82, at 3–4], the Debtor relies on the *Martindell* case for the general proposition that "a payment by a principal debtor will not operate to toll the statute of limitations as to a guarantor." 63 Cal. Rptr. at 778 (quoting *Purdy v. Maree*, 87 P.2d 390, 391 (Cal. Ct. App. 1939)).  But in so holding, the *Martindell* court observed that "[t]here was no provision in the guaranty that a part payment by [the principal debtors] would toll the limitations period as to [the guarantor]."  *Id*.  Here, that is not the case.  The Autopsy Guaranty contains the following provision:

> The obligations of Guarantor hereunder are joint and several, and independent of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against Guarantor, whether or not such action is brought against Borrowers and whether or not Borrowers be joined in any such action or actions.  **Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting his liability hereunder or the enforcement thereof.  Any payment by Borrowers, or other circumstance which operates to toll any statute of limitations as to Borrowers, shall operate to toll the statute of limitations as to Guarantor.**

Frcek Decl., Ex. 28, ¶ 3 (emphasis added).  The plain, unambiguous language of the Autopsy Guaranty reveals the intent of the parties to subject the guarantor, Peter Hoffman, to the general rule applicable to primary obligors, that is, that partial payment of a debt operates to extend the limitations period.

The undisputed record here shows that Peter Hoffman executed the Autopsy Guaranty in January 2009.  The *Forbearance and Workout Agreements* executed in November 2010 and October 2011 left the Autopsy Guaranty intact.  Between October 2011 and June 2017, Palm received payments at sufficient intervals to maintain the four-year limitations period under § 360 of the California Civil Code—the last payment made prior to Palm's receipt of the Foreclosure

Credit on June 1, 2017, was received by Palm on March 26, 2014. *See* Frcek Decl., ¶ 37, Ex. 32. That, coupled with the fact that Peter Hoffman contractually waived "the benefit of any statute of limitation affecting his liability" under the Autopsy Guaranty, *see* Frcek Decl., Ex. 28, ¶ 3, means that Palm acted within its rights to apply the Foreclosure Credit to the balance owed under the Autopsy Loan on June 1, 2017.

For those reasons, the Court grants summary judgment in favor of AMAG and denies summary judgment to the Debtor to the extent the Complaint asks this Court for a declaratory judgment that AMAG was required to apply the Foreclosure Credit to the Loan Balance.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the *Motion for Summary Judgment*, [ECF Doc. 51], filed by AMAG, Inc., is **GRANTED**;

**IT IS FURTHER ORDERED** that *Debtor Royal Alice Properties LLC's Motion for Summary Adjudication*, [ECF Doc. 56], is **DENIED**;

**IT IS FURTHER ORDERED** that the *Objections and Motion To Strike Paragraphs of the Supplemental Declaration of Peter M. Hoffman in Opposition to Defendant AMAG Inc's Motion for Summary Judgment*, [ECF Doc. 86], filed by AMAG, Inc., is **GRANTED IN PART AND DENIED IN PART**; and

**IT IS FURTHER ORDERED** that Debtor Royal Alice Properties LLC's Request for Judicial Notice, [ECF Doc. 58], is **GRANTED**.

A separate judgment on the Complaint filed in the above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, November 25, 2020.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE